# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

---

CVS PHARMACY, INC.,

        Plaintiff,

v.

ALBERT "AJ" LABUHN,

        Defendant.

CASE NO.: _____

---

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff CVS Pharmacy, Inc. ("CVS") files this Verified Complaint against Albert "AJ" Labuhn ("Labuhn") and alleges as follows:

## INTRODUCTION

Plaintiff CVS brings this action to enforce a covenant not to compete and a covenant not to disclose confidential information against Defendant Labuhn. Until giving notice of his resignation on April 18, 2024, Labuhn was the Vice President, Service Operations at Aetna Resources, LLC ("Aetna"), a subsidiary of CVS, where for more than a decade he oversaw, implemented, and analyzed CVS's strategic initiatives to improve performance across the organization.  Labuhn agreed to a Restrictive Covenant Agreement ("RCA") containing a one-year non-competition restriction as a term of his employment with CVS.  In recent years, a significant component of Labuhn's mandate has been incorporating automation,

artificial intelligence, and cutting-edge technology into CVS's efforts to, among other things, manage its workforce in clinical and call center operations, enhance customer experience across CVS's call and claim-processing centers, and maximize the performance of CVS's vendors. Labuhn has now informed CVS that he intends to perform precisely these same functions for CVS's competitor, Molina Healthcare ("Molina"), as its Vice President of Artificial Intelligence/Machine Learning ("AI/ML"). Labuhn's new role will utilize AI/ML solutions to improve Molina's clinical operations and quality processes. Labuhn's knowledge of how CVS uses AI/ML to enhance its own operations and quality processes—information that is highly confidential and the result of CVS's significant investment of time and resources—will serve as a roadmap for Molina.

Moreover, Labuhn's senior position within CVS and oversight of operations across the company gave him access to highly confidential information about CVS's business strategies and Medicare plan strategies. Specifically, Labuhn was heavily involved in Aetna's efforts to improve its Medicare Star Rating particularly by improving the customer experience. Medicare Star Ratings are awarded based on a company's performance vis-à-vis its competitors, meaning Molina's gain will be CVS's loss. CVS will, therefore, be directly and immediately harmed if Labuhn is permitted to take CVS's confidential information into his new

role with a competitor.  For these reasons, CVS seeks to enforce the RCA to which Labuhn agreed in June 2019.

## PARTIES

1.      CVS is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island.  CVS is the corporate parent of Aetna, which has its principal place of business in Hartford, Connecticut.

2.      On information and belief, Labuhn is an individual residing in Sanford, Florida.  Until his resignation, effective April 19, 2024, Labuhn was Vice President, Service Operations at Aetna.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000 and there is complete diversity between CVS and Labuhn.

4.      Venue in this District is proper under 28 U.S.C. §1391(b) because a substantial part of the actions or omissions giving rise to CVS's claims occurred in the Middle District of Florida.

## FACTS

### CVS's Aetna Business

5.      In November 2018, CVS acquired Aetna, one of the nation's largest insurers.  The merger combined Aetna's health care benefits products and services

with CVS's retail locations and medical clinics.

6.     Aetna provides health, dental, and vision insurance plans and services to approximately 39 million people.  In addition to private plans, Aetna offers Medicaid, Medicare Advantage, and prescription drug plans.

7.     Aetna operates nationwide and currently has nearly 50,000 employees.

8.     Labuhn was a member of the Operational Effectiveness team within Aetna's Operations department ("Operations").  The Operations department works across, and thus has insight into, all lines of Aetna's business.  It focuses on Aetna's strategic initiatives.   Within Aetna's Operations department, the Operational Effectiveness team is responsible for implementing, maintaining, and adapting internal support structures at Aetna that enable the company's operations.  The Operational Effectiveness team's mandate includes workforce management, vendor management, and quality control, among other things.  Its mission is to bring to life the Common Purpose in every client engagement, leveraging data, insight, creativity, and innovation to drive optimal outcomes.

9.     Every leader in the Operations department is responsible for continuous improvement of the processes they oversee.  For example, Labuhn's team directly managed the "productivity process" for Aetna Operations, which required him to consider improvements that could increase organizational

productivity. Such improvements are largely driven by leveraging AI and automation to increase the efficiency of processes throughout CVS's business lines.

## Labuhn's Role at CVS

10.    Labuhn has been employed at Aetna, now a subsidiary of CVS, for more than 12 years. Labuhn's most recent title was Vice President, Service Operations, within the Operational Effectiveness team. He directly oversaw Aetna's workforce management, program and project management, quality and analytics, and vendor management teams.

11.    As Vice President, Service Operations, Labuhn was responsible for more than 500 full-time employees at Aetna. His mandate was to support the implementation of technology solutions and continuous process improvement initiatives that create a personalized, cost effective, and compliant service experience. This role required Labuhn to learn about and evaluate AI tools from vendors and identify which tools should be deployed in CVS's business.

12.    Labuhn was responsible for high-level strategic thinking across Aetna and CVS's various departments. Due to the cross-cutting nature of Labuhn's role, he was routinely involved in meetings at some of the highest levels regarding CVS's and Aetna's business strategy.

13.    Labuhn participated in quarterly Senior Leader Calls at CVS that are led by executives at the highest levels of CVS, including Karen Lynch, the

President and CEO of CVS Health, and CVS's Chief Financial Officer.  These quarterly calls feature discussions of financial results, key topics CVS is focusing on, and CVS's business updates.  Labuhn attended a Senior Leader Call for CVS Health as recently as February 2024.

14.     Labuhn also participated in Senior Leader Calls for CVS that focused on confidential and proprietary topics like long-term projects for the company, giving Labuhn insight into CVS's strategic goals.  The Senior Leader focused on key initiatives affecting the entire CVS Health enterprise, including Aetna.  These updates included confidential financial and business highlights for the company. Labuhn attended one of these Senior Leader Calls as recently as February 2024.

15.     Finally, Labuhn attended CVS's Leader Live retreat.  Leader Live is an annual, multiday retreat that focuses on CVS's short- and long-term strategies for handling calls from customers, providers, and brokers.  The two-day program features messages from across CVS's lines of business, including talks from CEO Lynch, the President of Aetna, the President of CVS Caremark, and the Chief Pharmacy Officer, among others.  It further featured a talk from CVS's CTO on technology trends, with a focus on AI and the technology embedded into CVS's corporate strategy and consumer experience.  Labuhn attended the most recent Leader Live retreat in October 2023.

16.     Labuhn's participation in these meetings reflects not only his high-ranking position at CVS, but also his access to highly confidential, proprietary information about CVS's strategies across its business lines that is reserved for upper echelon employees who agree to be subject to restrictive covenant agreements that limit their post-employment activities.

17.     Labuhn used his insight into the company's high-level strategies and goals to facilitate improvements in CVS's operations.  Specifically, he had strategic oversight of CVS's workforce management of (1) Aetna Service Operations, Aetna Clinical Solutions, CVS Integrated Service Centers and HealthSpire Minute Clinic; (2) call quality across Aetna's call centers; and (3) claim quality across all of Aetna's lines of business, and (4) management of the numerous vendors and vendor employees who assist Aetna in staffing call centers and processing claims.  Labuhn also developed strategy across CVS to optimize innovation in its relationships with vendors.

18.     A key area of focus for Labuhn and the Operational Effectiveness team was to improve Aetna's Star Rating for Medicare Advantage and Part D. Each year, the Centers for Medicare & Medicaid Services (CMS) provides a Star Rating to providers of Medicare Advantage and Prescription Drug Plans, with the

highest performing plans receiving a Star Rating of five stars.[1]  The Star Rating is intended to measure the quality of services that consumers receive from a given Medicare Advantage and Prescription Drug Plan and enables consumers to compare different plans when selecting their healthcare plan.   Customer experience is a key metric in determining a plan's Star Rating.

19.    The Star Rating of an insurance plan in turn dictates the level of Medicare reimbursement that the plan will receive.   High performing plans receive greater reimbursement from Medicare, and low performing plans are at risk of being sanctioned and losing Medicare contracts.

20.    Insurance plans' Star Ratings are relative to their competitors.   That is, CMS compares competing insurance plans against one another and grades each insurance plan against its competitors in issuing a Star Rating.   As such, if one of Aetna's competitors improves its quality and thus its Star Rating, Aetna must make equal or greater improvements in the quality of its plan to maintain its Star Rating.

21.    This relative grading system makes it particularly valuable for insurance companies with Medicare contracts to replicate a competitor's tactics.

---

[1] Ctrs. for Medicare & Medicaid Servs., 2024 Medicare Advantage and Part D Star Ratings (Oct. 13, 2023), https://www.cms.gov/newsroom/fact-sheets/2024-medicare-advantage-and-part-d-star-ratings.

22.     For 2023, Aetna's plans' Star Ratings dropped to three stars.   In response, Aetna launched a series of initiatives to improve customers' experiences with the plan and, hopefully, improve its Star Rating.

23.     Labuhn was closely involved in Aetna's initiatives to improve customer experience, particularly in its initiatives focused on improving the quality of members' calls to Aetna regarding their plans.  As detailed below, many of these initiatives relied on AI/ML to improve the customer experience.

24.     These efforts were successful, and as of September 2023 (the most recent issuance of CMS's Star Ratings), Aetna's Star Rating improved to four stars.

### Labuhn's Role and Use of AI/ML in Call Quality

25.     As Vice President, Service Operations, Labuhn was responsible for strategic initiatives to improve call quality at Aetna's service and clinical operations, as well as for CVS Minute Clinic operations.

26.     Aetna fields calls from plan members, medical providers, and brokers at its contact centers.  The majority of such calls to Aetna's call centers are from plan members.

27.     Aetna's contact centers employ both in-house Aetna employees and employees from vendors to which Aetna outsources some of its call volume. Labuhn was responsible for strategic planning at both types of contact centers.

28.     Labuhn oversaw several initiatives to improve call quality during his tenure as Vice President, Service Operations.  One such initiative, which Aetna launched as part of its effort to improve customer experiences and thus the plan's Medicare Star Rating, was to deploy AI to automate monitoring and improve call quality.

29.     Currently, Aetna employs a team to listen to inbound calls into its call centers.  The team then grades those calls based on metrics like how effective and efficient the calls were.  Those grades are then used to coach and train the employees who work at Aetna's call centers.

30.     Labuhn oversaw an effort to automate these measures to grade and improve call quality.  Labuhn worked with an outside vendor to develop an AI/automation tool that could listen in on inbound calls to the call center.  The AI tool then generates a report on the call that includes feedback on metrics like how effective and efficient the call was.  Labuhn was directly responsible for building the business case for this AI tool and securing funding to invest in it.

31.     Labuhn also worked on testing a AI knowledge assistance tool that could be deployed to improve call quality.

32.     Labuhn was involved in testing this AI knowledge assistance tool across Aetna's platforms, and prior to his departure, was gathering data on its

effectiveness.  In fact, as recently as April 12, 2024, Labuhn reported to his supervisor regarding the tool's accuracy.

### Labuhn's Role and Use of AI/ML in Vendor Management

33.     Labuhn was also directly responsible for overseeing the operations of tens of thousands of employees at outside vendors who supported Aetna's service operations in the form of call and claim functions.  These vendors' chief functions include answering inbound calls from Aetna's customers and processing insurance claims.

34.     Aetna utilizes several vendor companies at a significant financial investment to assist in processing claims and handling calls from members.  Vendors are paid to process claims and handle calls.

35.     As part of his role at CVS in overseeing such vendors, Labuhn was privy to proprietary information regarding precisely how much Aetna pays each vendor.

36.     Labuhn's role in vendor management also proved critical in Aetna's response to its 2022 Star Rating.  Labuhn was accountable for driving significant improvement in Aetna's vendors' quality and member experience metrics, which have an impact on Aetna's Star Rating.

37.   Part of Labuhn's work at Aetna in vendor management involved partnering with a specific vendor on AI solutions that would improve the member experience or the quality of a call.

38.   Labuhn's efforts in vendor management were very successful for Aetna.  In just one year, programs that Labuhn spearheaded resulted in significant improvement in CMS's evaluation of Aetna's vendor calls.

**Labuhn's Role and Use of AI/ML in Program and Project Management**

39.   A third prong of Labuhn's operational role at CVS included heading up Aetna's Program and Project Management team.   This team ensures that questions, issues, and people are directed to the right contacts within Aetna's corporate center, and one of its major functions is to increase productivity across Aetna's enterprise.

40.   Labuhn's team oversaw cost-savings and productivity initiatives across all of Aetna's operations.  It was Labuhn's job to assess the progress of these cost savings projects.   This key role gave him visibility into Aetna's strategic information across the company.

41.   A significant portion of Aetna's cost-savings initiatives relate to implementing new technology, with a focus on AI/ML that gave Labuhn deep insight into how Aetna was leveraging AI/ML companywide.

42.     Labuhn was directly responsible for tracking the progress and effectiveness of the productivity initiatives.  Several of those initiatives were AI and automation solutions.  These solutions were in progress to deliver significant value to Aetna's operations in the form of cost reduction and quality improvement.

43.     Labuhn also oversaw the deployment of a foundational AI platform that serves as the base product through which Aetna launched its other major AI initiatives.

44.     Labuhn was in charge of deploying this platform to Aetna's outside vendors and call-facing colleagues.  By managing the deployment of the very system through which Aetna launches its AI tools, Labuhn gained critical visibility into Aetna's AI strategies and capabilities.

### Labuhn's Resignation from Aetna and Anticipated Role at Molina

45.     On or about April 18, 2024, Labuhn emailed a resignation notice to his direct supervisor, Michael Taday.  A true and accurate copy of Labuhn's resignation notice email is attached hereto as Exhibit ("Ex.") B.

46.     Labuhn's resignation was effective April 19, 2024.

47.     Labuhn informed CVS that he would be joining Molina Healthcare as the Vice President of AI/ML.  Labuhn intends to start in this role on May 13, 2024.

48.     Molina provides healthcare services and solutions, including healthcare insurance coverage.  It currently serves 5.1 million members across the United States.  Molina specifically specializes in government-sponsored health plans, including Medicaid, Medicare, Integrated Medicaid/Medicare, and Marketplace/Exchange plans.[2]

49.     Aetna also offers healthcare insurance coverage in the United States and directly competes with Molina for Medicare and Medicaid contracts and on the Marketplace/Exchange.  Aetna's Medicare business, for example, is worth billions of dollars to the company.

50.     According to the job description for Labuhn's intended new role at Molina, Labuhn would be "a senior leader who will drive the identification, development, and deployment of artificial intelligence and machine learning solutions that will enhance and optimize critical processes across the organization, such as clinical operations and quality processes."  A true and accurate copy of the job description is attached as Exhibit C.

51.     Labuhn was directly responsible for deploying AI/ML solutions— including but not limited to utilizing AI/ML solutions to improve quality processes—at Aetna.

---

[2] Molina Healthcare, Molina Health Plans, https://www.molinahealthcare.com/members/common/en-us/abtmolina/compinfo/mhp.aspx (last visited May 9, 2024).

52.    Labuhn's job description at Molina also includes "creat[ing] business cases for portfolio projects that will inform investment decisions by the Operating Council and participat[ing] in the strategic planning processes for the company." The role will further require Labuhn to "provide input and guidance on the role and impact of AI/ML on the business strategy and operations."

53.    At root, this describes the role of Labuhn's former team at Aetna—a team that by its very name focuses on Operational Effectiveness.  Labuhn in particular focused on how AI/ML could be leveraged to improve operational effectiveness.

54.    Labuhn's new role at Molina also would require him to "[m]onitor and evaluate the performance and outcomes of AI/ML solutions, and provide feedback and recommendations for improvement and optimization."

55.    Labuhn worked in the same AI monitoring capacity at Aetna, as he was asked to evaluate the effectiveness and performance of AI/ML.

56.    Moreover, Labuhn can only be considered qualified for the role at Molina because of his experience working with AI at Aetna.  The role called for a candidate with a "[p]roven track record of learning new techniques and impactful AI/ML solutions that enhance and optimize shareholder value."  Labuhn worked at Aetna for the last 12 years.  The advent of AI is a recent phenomenon.  Labuhn's experience at Aetna, and the confidential information he gained as a result, is the

exclusive means by which Labuhn could develop a "[p]roven track record" with respect to AI/ML solutions.

### Labuhn's Restrictive Covenant Agreement

57.     Labuhn entered into the RCA on or about June 5, 2019, in connection with a Restricted Stock Unit ("RSU") award.   The RSU award was the consideration for entering into the RCA and complying with its terms.  Ex. A, RCA § 1.

58.     Section 2 of the RCA provides that during Labuhn's employment at CVS and for 12 months following the termination of his employment, Labuhn would not "directly or indirectly[] engage in Competition" with CVS. Competition is defined as "providing services to a Competitor . . . that (i) are the same or similar in function or purpose to the services that [Labuhn] provided to the Corporation [i.e., CVS] at any time during the last two years of [his] employment by the Corporation; or (ii) will likely result in the disclosure of Confidential Information to a Competitor or the use of Confidential Information on behalf of a Competitor."  *Id.* § 2(a).  A "Competitor" is defined as "any person, corporation or other entity that competes with one or more of the business offerings of the Corporation," which expressly include both Medicare Part D services and provision of insurance (which in turn is defined to include "health

insurance products and services" and "managed health care products and services," among other things).  *Id.* § 2(b).

59.     In the RCA, Labuhn expressly agreed "to this enterprise-wide definition of non-competition which may prevent me from providing services to any of the Corporation's PBM, Retail, MinuteClinic, Long-Term Care, Health Management, Insurance, Administration and/or Infusion Competitors or any combination thereof during the Non-Competition Period."  *Id.* § 2(b).

60.     The restrictive covenant applies for "the period of 12 months following the termination of [Labuhn's] employment with the Corporation for any reason" (the "Non-Competition Period").  *Id.* § 2(d).

61.     This restriction is necessary to protect CVS's confidential information and prevent employees from intentionally or unavoidably using CVS's confidential information to compete unfairly against CVS.

62.     The RCA is "governed by and construed in accordance with the laws of the state of Rhode Island."  *Id.* § 19.

### Labuhn's Role at Molina Threatens Disclosure and Misuse of Aetna's Confidential Information

63.     Labuhn's operations-wide knowledge of Aetna's deployment of AI/ML threatens Aetna's competitive stature vis-à-vis Molina and threatens to misuse Aetna's confidential information.

64.     Labuhn has vast knowledge of how Aetna has deployed its cutting-edge AI tools to improve customer experience across its operations.  He has further analyzed the effectiveness and implementation of such tools at Aetna, giving him inside, confidential information on how Aetna plans to improve its customer experience using AI and ML.

65.     While the disclosure of Aetna's confidential information presents a sufficient threat to Aetna's business, this threat is exacerbated by Aetna's and Molina's direct competition in the Medicare space.  Because CMS's Star Ratings are relative, any improvements in Molina's Star Rating come at a direct cost to Aetna.  That is, if Molina's customer experience improves, Aetna must at least match Molina's improvements to simply maintain its Star Rating.  Labuhn's ability to import Aetna's AI/ML solutions to Molina therefore directly threatens Aetna's Medicare business.

66.     Billions of dollars of Aetna's business are contingent on maintaining a strong Star Rating.  Any decline in Aetna's Star Rating represents a serious threat to Aetna's business, and this is particularly true when Aetna's competitors have inside information on its efforts to improve customer experience, a major component of the Star Rating.

67.     The one-year restrictive period in Labuhn's RCA is particularly important with respect to Aetna's AI/ML capabilities.  As health insurance

companies work to integrate AI and ML capabilities into their business models, they make drastic advances over the course of even a few months. Preventing Labuhn from bringing his knowledge of Aetna's current AI/ML capabilities—capabilities that Labuhn was reporting to his superiors on less than one month ago—to a competitor for one year provides Aetna breathing room to continue to innovate without the threat of tipping off its competitors to innovations that stem from Aetna's confidential information and investments.

## COUNT I – BREACH OF CONTRACT

68.    CVS repeats and re-alleges the allegations contained in paragraphs 1–67 above.

69.    Labuhn's Restrictive Covenant Agreement (the "RCA") is a binding and enforceable agreement between Labuhn and CVS.

70.    The covenant not to compete within the RCA is reasonable in time and scope and serves the legitimate business purpose of protecting CVS's confidential information and goodwill.

71.    Labuhn has breached, or has threatened to breach, the RCA by becoming employed by Molina Healthcare in a competitive position within 12 months of the termination of his employment at CVS.

72.    CVS has performed each and every obligation and condition required of it pursuant to the RCA.

73.    CVS has been or will be harmed by Labuhn's breach of contract and will continue to be harmed as long as Labuhn is permitted to work at Molina.

## REQUEST FOR RELIEF

Wherefore, Plaintiff CVS Pharmacy, Inc. respectfully requests that this Court grant the following relief:

A.    Enter judgment for Plaintiff against Defendant;

B.    Award Plaintiff damages in an amount to be determined at trial;

C.    Issue preliminary and permanent injunctive relief to restrain and enjoin Defendant from working at Molina Healthcare for a period of 12 months from the date of the order;

D.    Award Plaintiff attorneys' fees, costs and expenses in this action; and

E.    Grant any such other relief that the Court deems just and proper.

Dated:  May 10, 2024

Respectfully Submitted,

CVS PHARMACY, INC.

By its attorneys,

*/s/ Dennis M. McClelland*

Dennis M. McClelland
Florida Bar No. 0091758
dennis.mclelland@phelps.com
PHELPS DUNBAR LLP
100 South Ashley Drive
Suite 2000
Tampa, Florida 33602-5315
Tel.:  813-472-7550
Fax:  813-472-7570

-and-

Michael L. Rosen, BBO #559954
(admission *pro hac vice* to be sought)
mrosen@foleyhoag.com
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel.:  617-832-1000
Fax:  617-832-7000

Attorneys for Plaintiff CVS
Pharmacy, Inc.

## <u>VERIFICATION</u>

I, Michael Taday, verify under penalty of perjury under the laws of the United States of America that I have read the foregoing Verified Complaint for Injunctive Relief and Damages, and that the statements contained therein are accurate to the best of my knowledge, information, and belief.

_____
     Michael Taday